## CLINTON VS. ESTES.

The connection of individuals in an unlawful enterprise being shown, every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them: those acts and declarations of one conspirator, which were made and done during the pendency of the criminal enterprise, and in furtherance of its objects, and which explain and illustrate the *res gestæ*, are admissible as evidence against his co-conspirator; not those which are made after the transaction, and merely recite the occurrences:

To determine the mental capacity of an individual to make a contract at a particular time, it is often necessary to enquire into the state of his health, appearance, conduct, habits, etc., for some time, both before and after the period in question; but no absolute rule, limiting the extent of the examination to fixed periods, to be applied uniformly, can be laid down. Where a party was afflicted with epilepsy, and was laboring under the effects of a fit when he made a bill of sale of his negroes, it was important to show how long he had been afflicted with the disease, and the effects of the paroxysms upon his health, mind, etc., to enable the jury to form a correct judgment of his mental capacity, at the time the bill of sale was made.

The error in permitting improper testimony to be given to the jury, where it could not have prejudiced the party, is no cause of reversal—as where the same facts were abundantly proven by other witnesses.

Proof of what a witness swore upon a former trial is admissible in evidence on a subsequent trial of the same cause, if he be a non-resident, and out of the jurisdiction of the court; but if his place of residence be known, and his testimony can be taken under a commission, it is within the discretion of the court to issue a commission to take his testimony, or admit proof of what he formerly testified, and the decision of the court admitting the proof must be regarded as conclusive unless there be shown gross abuse of such discretion.

The declarations of a vendor, made after the sale, are not admissible to impeach the title derived from him; but he is a competent witness for that purpose. (17 *Ark.* 179.)

The consideration recited in a bill of sale is open to explanation or contradiction by parol proof; and both parties may go fully into proof of what were really the considerations for the sale, regardless of the recitals in the bill of sale, where the

object is to show, on one side, that it was obtained by fraud, and on the other, that it was a fair transaction.

It is equally a rule in courts of law and courts of equity, that fraud is not to be presumed, but must be established by proof, and where the question at law is, whether a bill of sale was obtained by fraud, the facts and circumstances attending its execution, and from which the fraud is attempted to be deduced, must be stated, and the jury, under instructions from the court, must determine whether or not they establish the fraud.

*Appeal from the Circuit Court of Franklin county.*

Hon. FELIX I. BATSON, Circuit Judge.

D. WALKER, for the appellant.

The opinions of a witness, that a party has not the mental capacity to make a contract, are worthless, only so far as they are based upon facts declared in the evidence of the witness. See *Sears vs. Shafer,* 1 *Barbour S. C. R.* 412; 3 *Wash. Cir. Court Rep.* 589; *Cowen and Hill's notes,* 2 vol. *Phil. Ev.* note 529; 3 *Dev.* 357.

In this case the plaintiff relies upon his mental incapacity to contract. The law presumes every one of sound mind, and it devolved upon the plaintiff to prove that he was at the time incapable of contracting. We submit, that the facts relied upon, fall very far short of such proof.

We contend, that the proper inquiry is, as to the state of mind, at the time the contract is made, and evidence of plaintiff's incapacity to contract, either before or after, is inadmissible. See 1 *Beck's Med. Juris.* 380; *Van Alst vs. Hunter,* 5 *J. C. R.* 148; *Dean Med. Juris.* 555–8; *Jackson on dem., etc., vs. King, et al.,* 4 *Cow.* 207; *Odell vs. Buck,* 21 *Wend.* 142; 4 *Coke,* 123; *Co. Little* 247, *a;* 26 *Wend.* 255; *Blanchard vs. Nestle,* 3 *Denio* 37; 2 *J. J. Marshall,* 331. This rule, we insist, was disregarded by the Court below, by permitting the witnesses to testify in regard to the state of plaintiff's health and mind for years, both before and after the sale to John Estes; and after the negroes were taken by defendant.

14

In regard to the evidence offered to prove that the slaves were taken from the possession of the defendant, we insisted before the Court below, and submit here, that in order to introduce the statements and acts of third persons, as evidence, it must appear that such persons conspired with the defendant to do an unlawful act. *See* 2 *Greenleaf, Ev. p.* 91. The law, for that particular purpose, and whilst it is being executed, treats them as one person, and makes the acts and declarations of one binding upon all. But then the enquiry is limited to the acts and declarations of the conspirators at the time of the conspiracy, and in furtherance of its object, and not to such as are made either before or after the act is committed. It is said, *Greenleaf Ev. vol.* 2, *p.* 94, that " what was said or done before or afterward, is not within the principle of admissibility." So in *State vs. Dean,* 13 *Iredell,* 63, it was held that " the declarations of a co-conspirator, made after the offence had been committed, is incompetent evidence. In support of the above, see 1 *Phil. Ev.* 94 *and* 97; *State vs. Paul & Lannia,* 1 *Hawks.* 442; *Greenleaf Ev.* 2 *vol. 5th Ed. pages* 139; 297 *and* 8, *and authorities there cited.*

The statements of John G. Estes, drawn out upon his examination as a witness, upon a former trial of this cause, at the instance of the plaintiff, and deposed to by one of the attorneys for the plaintiff, should have been excluded for several reasons:

1. He was himself competent to testify, and in the absence of any excuse, in not having been in person before the Court, or his deposition, secondary evidence, otherwise unexceptionable, should have been excluded.

2. He was not one of the conspirators, not present when the slaves were taken, and as such his testimony could not be received.

3. Even if he was, the statement made by him did not relate to the taking, but to a verbal part of the contract, between himself and plaintiff, and not being connected with the conspiracy, could not be given in evidence.

4. The statements tended to set up a contract in disparagement of defendant's, to whom he had sold the slaves, and having been made after the sale to defendants, was for that reason inadmissible.

The contract, even if proven to have been made by fraud, was not void but voidable only, as distinctly held upon authority in *Blagg vs. Hunter*, 2 *Kent's Com.* 452; 2 *Aiken* 162; ˙13 *Miles & Wesley* 623; *Smith on Contracts*, 232. And in accordance with the decision of our Court, it was held in *New York Malleaivan co. vs. Bentley*, 12 *Barbour* 641, " That a sale of property procured by fraud, is not absolutely void but voidable, at the option of the vender." See also 13 *Alabama* 752; *Barnwell vs. Stanton*, 2 *Ala. Rep.* 195. The defendant has given evidence of a clear legal title in himself. The plaintiff attempted to defeat that title, and thereby restore the title to the slaves in himself, which it was incumbent on him to show, to entitle him to recover. He attempted to do this by proving fraud and imposition when not of sound mind. In order to make this available, to him, it devolved upon him to prove first. the fraud: 2d, a rescission of the contract upon discovering the fraud, and a delivering up of the note given for the slaves. Therefore, if the contract had been shown to be fraudulent (which was not done) without proof of a rescision of the contract, or an offer to rescind before the suit was brought, such would not have reinvested him with title, so that he could maintain an action for the slaves.

FOWLER & STILLWELL, for the appellants, argued this cause upon the instructions; and contended that the evidence proving the declarations of Trammell was not competent. 10 *Ark.* 639; 11 *Ib.* 261; 14 *Ib.* 105; 16 *Ib.* 635; 2 *Stark. Ev.* 24, 25, 233, *etc.*

Proof of appellee's condition at any time but when the contract was made, was under the circumstances inadmissible. 2 *Stark. Ev.* 931, *note.*

The proof of what John G. Estes said on a former trial was

not competent. *Prather vs. Frazier and wife,* 11 *Ark.* 261; 2 *Phill. Ev. C. & Hill's notes,* 440.

His testimony impeaching the title of his vendee should have been excluded, had he been personally present. *Ferriday vs. Selser,* 4 *How.* (*Miss.*) 520; *Johnson vs. Cunningham,* 1 *Ala.* (*N.S.*) 255; 2 *Cow. & Hill's notes on Phill. Ev.* 74; 1 *Tenn.* 300; 1 *Stew.* (*Ala.*) 141; 1 *Paige C. R.* 568; 6 *John.* 5; 11 *Humph.* 589.

CUMMINS & GARLAND, for the appellee.

It was competent for Trammell, as one of the conspirators, in running off the negroes, to tell the circumstances connected with the taking them off. 3 *Stark. Ev.* (*2d. Amer Ed.*) part 4, p. 403; 3 *Serg. & R.* 220; 4 *Cranch* 75; 1 *Robinson's report of Burr's Trial,* 21; *Stewart vs. Hanson,* 35 *Maine,* 506; 1 *Ohio R.* 26; *Dawson vs. Hall,* 2 *Mich.* 590; 13 *Ark.* 236; 25 *Verm.* 171.

Evidence as to the capacity of Estes before and after making the contract was competent. *Brungard vs. McElroy,* 21 *Ala.* 311; 11 *Geo.* 337; 3 *Stark Ev.* part 4, p. 1702, *et seq;* 5 *John.* 144; 1 *Peters* 163; 16 *Mass.* 348.

Evidence as to what witness has before stated or testified is competent, 1 *Stark. Ev.* 520; *id. part* 4, p. 1758, 1759; 16 *Ark.* 568.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 30th of August, 1850, Andrew Estes commenced an action of replevin, in the cepit, against Willis A. J. Clinton, in the Crawford Circuit Court, for the recovery of slaves, named *Milly, Bob, Angeline, Sam, Betty, Malissa* and *Ned.*

The defendant pleaded *non cepit,* and property in himself, to which issues were made up, and upon his application, the venue was changed to the Franklin Circuit Court, where, after several mistrials, the cause was finally tried at the June term, 1856, and verdict and judgment in favor of plaintiff, and the defendant appealed.

No motion for a new trial was made, but the case was brought here on exceptions taken by the defendant to decisions

of the Court, in progress of the trial, in reference to the admissibility of testimony and instructions to the jury.

The plaintiff had been the owner of the slaves in controversy for many years prior to July, 1850, and at that time had them in possession, at his residence, on the Osage river, in the State of Missouri, when they were forcibly seized, and taken from him, by the defendant, in company with other persons, and brought to Crawford county, in this State, where this suit was commenced, in the name of the plaintiff, for their recovery, The defendant claims title to the slaves under a bill of sale, alleged to have been executed by the plaintiff, to his son, John G. Estes, on the 28th July, 1849, and a bill of sale made by him to the defendant, on the 25th July, 1850, the day before the slaves were taken from the possession of the plaintiff.

On the part of the plaintiff it is insisted that the bill of sale from him to his son, John G., was obtained by fraud, etc., and this was the principal point of contest in the Court below.

1. The first point reserved by the defendant's bill of exceptions is, that the Court permitted the plaintiff to give in evidence the statement of Trammell, one of the persons who assisted the defendant in taking the slaves from the possession of the plaintiff, and running them off to Arkansas.

In order to a full understanding of this point, it is proper to state the substance of the testimony introduced by the plaintiff, on the examination in chief, in connection with the declarations of Trammell.

Bejamin Davis testified, in substance, as follows: The plaintiff, an aged man, resided on a farm upon the Osage river. There was no white person upon the place at the time but himself. The defendant, Trammell, witness, and others, got aboard of a flat-boat, lying on the river, some distance above the plaintiff's residence, on which a cabin had been fitted up a day or two before, and floated down to the upper end of plaintiff's farm, where they landed about two hours by sun. Some of the company went down to see if they could make any discovery of the negroes, and, on their return, the

boat was dropped down opposite to the plaintiff's house. They found six of the negroes (all of them but old *Milly,*) on the shore; seized them and put them on board the boat, in the cabin. The defendant and *Trammell*, in order to get *Milly* to the boat, went to the house, and told her that one of the boatmen had cut *Bob* with a knife, and she had better go and see about it. She refused to do so until she went to see the old man, the plaintiff. The defendant, Trammell, plaintiff and Milly, came down to the boat together, bringing a bottle of *camphor* with them, and Milly was put on board of the boat. The defendant told the plaintiff that he had purchased the negroes from his son, John G. Estes, and had a clear bill of sale for them. After Milly was taken aboard, the boat was shoved out, run down a mile or so, and landed on a bar, and the negroes taken ashore; and that was the last witness saw of them. It was the calculation of the party to take the negroes, whether plaintiff consented or not. When the boat was shoved off, the plaintiff exclaimed, that he would get a company and follow them, and take the negroes. Witness had *understood from the defendant*, or one. *Dodson*, that John G. Estes had purchased the negroes, and that they had run away from him, and gone back to the plaintiff.

*Thomas W. Cotton*—Had lived near the plaintiff for fifteen years; during most of which time, up to July, 1850, he had in his possession and exercised ownership over the slaves in controversy. They were worth $4,000 when they were *taken from him.*

The plaintiff then introduced a witness by whom he proved, that witness first saw the negroes in controversy in the possession of one Brown & Trammell, in Van Buren, Ark., in 1850. They had been apprehended as runaways. Witness had a conversation with *Trammell*, who stated that *they* wanted to do something about the negroes, or he would go on with them— that he wanted to be stopped legally. He said that he, John G. Estes, Clinton (the defendant), and others, took the negroes from plaintiff's, on the Osage river, in Missouri; that John G.

Estes made a contract with Clinton, by which he sold to Clinton the negroes for $3200 or $3300. That he (*Trammell*) witnessed the bill of sale. That it was understood by the parties that Clinton was to take the negroes south, if he could get hold of them—John G. had not possession of the negroes at the time of the sale. They were at the plaintiff's. That it was understood that if Clinton could get hold of the negroes, he was to take them south, sell them to pay the expenses, and return and pay off the note, and divide the profits between them. Trammell said that they got possession of them by going down to a store, fixing up a boat, and going down to where the negroes were. That they found them on the bank of the river, on Sunday evening. The negroes were going across the river to a meeting. That he *Trammell*, defendant, and others, nabbed six of them and put them in a room on the boat. That they went up to the house, and got the old woman, and brought her down. It was near night. They had horses below the plaintiff's house; pushed off the boat, and went down to where the horses were—traveled that night, laid by the next day, and traveled next night, and after that, traveled in the day."

" To all of which testimony, the defendant objected at the time, and moved the Court to exclude it from the jury; because the testimony of said witnesses related to the confessions and statements of Trammell, not a party to the suit; and to all that part of the testimony not relating to the taking of the slaves from the possession of the plaintiff, as variant from the written contract."

But the Court overruled that objection, and permitted the witness to testify as above, upon the ground that Trammell was a co-conspirator.

Plaintiff also proved, by *Rev. Mr. Mitchell*, that, in August, 1850, he met defendant near Springfield, Mo., who told him that he had possession of plaintiff's negroes, and that they were in charge of *Brown & Trammell*, and he had instructed them to take the negroes through Greenfield, Mo., in the direction of the Cherokee nation, and there turn to the left, and

cross Arkansas river at Ozark. That witness being then on his way home, in plaintiff's neighborhood, defendant requested him to say nothing about having seen him there, and that if any persons made any enquiries about him or the negroes, to give them evasive answers; and said that he knew he could not hold the negroes in Missouri, but that if he could succeed in getting them south, he would ask no odds. Witness then enquired of defendant if he would sustain any loss in case the negroes were re-captured, and the defendant answered in the negative, and said that John G. Estes was good to him. Witness then asked defendant if he thought it was right in John G. Estes to take the negroes out of the country; and defendant said yes, that it would be the means of separating plaintiff and old *Milly*.

Here the plaintiff rested.

*Conspiracy* consists of a combination and agreement, by two or more persons, to do some illegal act; or a combination and agreement to effect a legal purpose by illegal means. *Regina vs. Vincent*, 9 *Car. & P.* 91; 2 *Halstead's Ev.* 177.

Mr. Bouvier (1 *Dic.* 281) defines it to be an agreement between two or more persons to do an unlawful act, or an act which may become, by the combination, injurious to others.

Conspiracies are of two kinds: 1st. Against the public, or such as endanger the public health, violate public morals, insult public justice, destroy the public peace, or affect public trade; 2d. Against individuals, such as have a tendency to injure them, in their persons, reputation or property. *Ib.*

At the point where the plaintiff rested in his evidence, he had clearly made out a *conspiracy*—a combination by the defendant Trammell and others, forcibly to take from him, and carry off, slaves which were in his possession, and of which he was *prima facie* the owner.

The conspiracy was sufficiently made out to warrant the admission of the declarations of *Trammell*, as a co-conspirator, if competent in other respects. 1 *Greenleaf Ev., sec.* 111; *Doghead Glory vs. State*, 13 *Ark.* 239.

The connection of individuals in an unlawful enterprise being shown, every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each of them.

Care must be taken that the acts and declarations, thus admitted, be those only which were made and done during the pendency of the criminal enterprise, and in furtherance of its objects. If they took place at a subsequent period, and are, therefore, merely narrative of past occurrences, they are to be rejected. 1 *Greenleaf Ev.* 111.

Declarations of one conspirator, made after the transaction, and merely reciting the occurrences, are not admissible against another. *State vs. Dean*, 13 *Iredell* 63.

Declarations (says Mr. PHILLIPS) or writings *explanatory of the nature of the common object*, in which the prisoner is engaged, together with others, are receivable in evidence; provided they *accompany* acts done in the prosecution of *such object*, arising naturally out of these acts, and not being in the nature of a subsequent statement or confession of them. 1 *Phillip's Ev.* 201.

It may be difficult (says Mr. Justice WELLS) to determine, at all times, when declarations shall be received as a part of the *res gestæ*. But when they explain and illustrate it, they are clearly admissible. Mere narratives of past events, having no necessary connection with the act done, would not tend to explain it. But the declaration may properly refer to a past event as the true reason of the present conduct. *Stuart vs. Hanson*, 35 *Maine* 509.

At what time the declarations of *Trammell*, admitted by the Court, were made, does not clearly appear from the bill of exceptions. The slaves were taken from the plaintiff on the 26th July, 1850, and replevied in this suit on the 30th August following. It is probable that the declarations were made between these periods. If at the time they were made, Tram-

mell's connection with the slaves had ceased—if they had been taken out of his possession, and he spoke merely of past occurrences, his declarations were not competent evidence against the defendant. But if he was in the possession of the slaves at the time, on his way south with them, aiding in attempting to carry out the original purpose of the conspiracy, as is probable from the language used by him, etc., his declarations, explanatory of the purposes for which the slaves were taken, the mode in which he and his co-conspirators obtained possession of them, and the disposition to be made of them, were competent evidence.

There is nothing in the objection that part of *Trammell's* statements were variant from the written contract (the bill of sale) between John G. Estes and defendant. Plaintiff was not party or privy to the instrument, and was in no way estopped by its provisions or recitals. *Hensky vs. Brodie*, 16 *Ark.* 519.

Independent of the declarations of Trammell, however, the fitting up of the boat, the taking of the slaves from the possession of the plaintiff, and the running of them off to this State, by the defendant and his associates, were fully proven by other witnesses in the cause.

2d. After the defendant had introduced the bills of sale relied on by him for title to the slaves, with testimony relative to their execution, the consideration agreed to be paid by John G. Estes to the plaintiff for the slaves, the capacity of the plaintiff to contract, etc., etc., the plaintiff proposed to introduce, by way of rebutting testimony, the depositions of *Lucinda Johnson, Jesse R. Johnson, Thomas W. Cotton, John M. Jackson, Jonathan Loveall, Elizabeth Houser,* and *Robert Pully.* To the reading of so much of these depositions as related to the mental capacity of the plaintiff at other and different times than that at which the bill of sale from plaintiff to John G. Estes was executed, or sometime shortly preceding or following the date of its execution, the defendant objected; but the Court overruled the objection, and permitted the testimony, to which the objection related, to go to the jury, as conducing to prove

the state of mind or capacity of the plaintiff to contract, at the time the contract was made.

The bill of exceptions failing to point out definitely the portions of the depositions objected to, it is necessary to state the substance of each of them, in order to determine whether there be any irrelevant matter in them or not:

*Lucretia Johnson*—Had known plaintiff seven or eight years, was at his house on the day the bill of sale from him to his son, John G., was made. (28th July, 1849.) Plaintiff's turn was more singular than I ever saw it—did not know what was the matter with him—but he did not seem to be natural. It did not look to me that he could attend to business. Was at his house two or three hours. He did not lie down during the time. He was not in his right mind. My husband and myself went to plaintiff's house to stay all night—got there about 12 o'clock, and left about middle of afternoon. When we made a motion to start, plaintiff said; "are you not going to stay all night?" His strange manner of acting was the reason we left when we did. I thought he was either mad or sick. He did not act as he usually did when I had seen him, and I thought he had been having fits. Did not think he was competent to transact business. Mr. Pully offered him some money, which he said he owed him. Plaintiff told him he did not recollect that he owed him anything, but if he did, he might pay—and when Mr. Pully paid him, he threw it down on the floor.

*Jesse R. Johnson*—Had known the plaintiff for some years. Was at his house for two or three hours on the day that John G. Estes obtained the bill of sale from him for the slaves, as I have since been informed. The old man had frequently insisted that I should pay him a visit, and stay all night, and I went, on the day referred to, with the calculation of staying all night. But the old man seemed so different in conversation and appearance to what he had formerly been, I concluded I would not stay all night. Cannot tell the cause of his appearing thus. Do not know that he spoke to me or any one else, while I was there, except in answer to questions.

When I got there, John G. Estes, Deverieux Pully and Robert Pully were there. John G. did not take any of the negroes with him when he left, etc.

*Thomas W. Cotton*—When I saw plaintiff, about July, 1849, he was complaining. He was an old man, and in feeble health. He told me he had been having fits, and I learned from others it was so. When I saw him, up to the time of his leaving here, he was complaining, and had the appearance of being in bad health. I was at his house directly after the negroes were taken, and he appeared then to be in bad health. Plaintiff had the family of negroes in controversy ever since I knew him. They never belonged to any one else that I knew of.

*John M. Jackson*—Have known plaintiff eight or ten years, and for three or four years before the difficulty about the negroes, was intimately acquainted with him—frequently at his house—resided about two and a half miles from him. From July, 1849, to July, 1850, frequently saw him, and he was always complaining. He was afflicted with fits, as they were called. I noticed that he failed to recollect things, and on remarking to him about it, he said that soon after having these fits, or spells, he could not recollect things. Before he was so afflicted, he was remarkable for a sound mind and good memory. Slaves worth in 1849, $4,500. Frequently saw plaintiff soon after he had fits, and he seemed dull and studid—at some times more than at others. He seemed averse to conversation, unless to answer questions, and was quite different from what he appeared at other times. Plaintiff had five or six children, but none of them living with him at the time his negroes were taken. His wife was with one of her daughters at that time.

*Jonathan Loveall*—Plaintiff was afflicted with fits, according to reports, some two years before July, 1849. I went to plaintiff's about 10 o'clock of one day—he had one fit about an hour after I went there, and another after dark. He appeared to be insensible at the time of having the fits, and all night. I sat up with him and tried to give him some medicine. Left him about 8 o'clock next morning—I had been out of the house,

and just before starting, went in. He had got up and was sitting by the fire. He spoke to me, and asked me how I was, and how all were at home. He did not appear, from his manner and actions, to recollect having seen me before. I went to plaintiff's with the view of trading, but finding him in no fix for trading, I left, and left word that when he got in a condition to trade, to send me word. In about four or five days he sent for me; I went, and he appeared in bad health, though he was smartly recruited from the time I was there before.

*Elizabeth Houser*—Been acquainted with plaintiff for fifteen or twenty years. Resided about two and a half miles from him. He had been afflicted with fits some two years before his negroes were taken from him. He sent to my house for me, and had a fit after I arrived there, and I was told he had one before. The fit prostrated him, and he did not appear to know anything while I stayed, which was about two or three hours. He did not appear to be as he was before he had fits—was not as sociable and talkative. This was a short time before the bill of sale was said to have been given to John G. Estes—cannot tell exactly the time. Plaintiff had no white family living with him. His negroes were there. He was quite an old man, and in feeble health at the time referred to.

*Robert Pully*—Was sent for to go to plaintiff's residence, about 28th July, 1849, and went with my father. Plaintiff and John G. Estes were there. *Jesse R. Johnson* and *wife Lucretia* came before we left. Father and myself witnessed a bill of sale, on that day, from plaintiff to John G. Estes, for the slaves in controversy. They were all that plaintiff owned at the time. John G. Estes presented the bill of sale to plaintiff, and showed him where to make his mark, and requested me and my father to witness it. Plaintiff appeared to me different from what he was at other times, inducing me to believe that he was not in his proper mind. One circumstance, among others, that induced that belief was, that we had had a settlement in March, and I told him that I owed him something, and was ready to pay him! He replied that he did not know that I owed him anything, but

was satisfied with anything I said about it.   I gave him fifty
cents, and told him to give me a dime, as forty cents was what
I owed him.   He gave me the dime, and took the fifty cents
and shot it into the house as a boy would shoot a marble.   I
think I saw one of the negroes pick it up.   Plaintiff seemed to
be in a gloomy, moping, moody state, not disposed to talk, only
to answer questions—more so than I had ever seen him before.
When at himself, he was more disposed to be lively, pleasant
and talkative than neighbors generally are.   John G. Estes did
not stay at plaintiff's more than half an hour.   Dinner was on
the table, and John G. insisted on father and myself taking din-
ner, etc.   Plaintiff had no white person residing with him at
the time.   He had been afflicted with fits for two or three years
before, as I understood, and had a fit immediately, or a few
days before this time, as I learned, which, I understood, was the
cause of his illness and being so puny.

In *Grant vs. Thompson,* 4 *Con.* 208, Hosmer, Ch. J., said:
" In the investigation of the question of sanity, which often is
of great difficulty, it is frequently indispensable to go into the
history of the supposed lunatic's mind, both before and after
his contract, in order to ascertain his real condition at the mo-
ment of entering into an agreement.   Such testimony is un-
doubtedly admissible, and such has been the invariable practice.

In *Kinne vs. Kinne et al.,* 9 *Conn.* 102, it was held that the
question of capacity relates exclusively to the time when the
will was made; and though evidence of the testator's conduct
before and after that time was admitted, it is received only to
show the state of his mind at the time.

Mr. Greenleaf says: The state and condition of mind of the
party is proved, like other facts, to the jury; and evidence of
the state of his mind, both before and after the act done, is
admissible.   2 *Greenlf. Ev.,* sec. 371; see also, *Inhabitants of
Hopkinton vs. Inhabitants of Upton,* 3 *Metcalf* 164.

Facts arising so long after the act as to have little or no ten-
dency to show the actual state of the party's mind at the time

of the act, should be excluded. *Dickinson vs. Barber*, 9 *Mass.* 225.

The causes which produce the several species of insanity, are numerous, and their effects are as diversified as the mental, moral and physical organizations of the persons afflicted by them. To determine the mental capacity of an individual at a particular time, it is often necessary to enquire into the state of his health, his appearance, conduct, habits, etc., etc., for some time before and after the period in question. No absolute rule limiting the extent of the examination to fixed periods, to be applied uniformly, can therefore safely be laid down, in consequence of the variety of cases which occur. Much must be left to the sound discretion of the presiding judge, to be governed by the peculiar features of each particular case.

In the great case of *Alice Lispenard's Will*, 26 *Wend.* 255, the examination took a wide range.

The capacity of *Alice* to make a will was contested on the grounds of *idiocy*. She was born in 1781, made her will in 1834, and died in 1836. The examination of witnesses as to her mental capacity, etc., extended from her early infancy to her death.

In *Kelly's Case*, (15 *Ark.* 598,) the examination extended back twenty years or more, for the purpose of showing that Greenberry Kelly, at the time he executed the deed of gift to his nephew, was laboring under *dementia*, resulting from palsy, intemperance and old age.

In the case of *McDaniel's Will*, 3 *J. J. Marsh.* 332, the testator was stricken down with paralysis about four years before his death, and some two years prior to the time he made his will; and the examination seems to have gone back to the time he was first stricken with the disease, for the purpose of showing its progress of injury to his body and mind, down to the time of his making his will, etc.

These are but examples of what seems to be the general practice. See, also, *Jackson vs. King*, 4 *Cowen* 218; *Odell vs. Buck*, 21 *Wend.* 142.

In the case before us, Andrew Estes, the plaintiff, appeared to have been afflicted, for one or more years before the making of the bill of sale to his son, with epilepsy. This disease, it is said, seldom continues for any length of time without destroying the natural soundness of the mind, (the material organs through which it acts) rendering the patient listless and forgetful, indisposed and unable to think for himself, yielding without any will of his own, to every outward influence, and finally sinking into hopeless fatuity, etc. *Ray on Insanity*, 389. Its fatal effects depend much, however, upon the constitution, etc., of the subject, and the frequency and violence of the paroxysms, *Ib.* It appears from the testimony of several witnesses, that the plaintiff had a paroxysm a few days before the bill of sale was executed, and was laboring under its effects at that time. It was important, therefore, to show how long he had been afflicted with the disease, and the effects of its paroxysms upon his health, mind, etc., to enable the jury to form a correct judgment of his mental capacity at the time the bill of sale was made.

3d. The Court permitted the plaintiff, against the objection of the defendant, to read in evidence that portion of the deposition of *Benjamin Jones*, which relates to statements made to him by *Morgan*, *Davis* and *Trammell*, who assisted the defendant in taking the slaves from the plaintiff. The witness states that he heard them say, that they went down with a boat to the plaintiff's place, and got the negroes. They also said that defendant was along, and participated in getting them. Did not hear them say when the boat was fitted up, but they said they started from near Erie, twenty miles above plaintiff's by water.

The witness does not state when the declarations were made to him. There is nothing in his deposition, from which it can be inferred that they were made during the time the parties were engaged in taking and running off the negroes, or while they had them in possession, attempting to carry out the purposes of the combination. The Court, therefore, erred in permitting the proof of these declarations to go to the jury. But

the defendant could not have been prejudiced by the error, because the same facts were abundantly proven by a number of other witnesses on both sides, who saw or participated in the taking of the slaves, or heard the defendant's statements in reference to the matter.

These remarks are also applicable to that portion of the deposition of *Thompson J. Kelly*, which proves similar declarations by *Morgan*, *Davis* and *Trammell*.

The bill of exceptions also states, in this connection, that the defendant objected to the reading of such parts of the deposition of *Burnett*, as relate to the declarations, conduct and mental capacity of the plaintiff, after the slaves were taken from his possession by the defendant.

· The deposition shows that after the negroes were taken, the plaintiff made efforts to procure assistance to follow the party, and retake the slaves. That he was trying for a number of days and nights to find out where the slaves had been taken to, etc., etc. All of which, we think, was competent to show that he did not acquiesce in the taking, and that he was asserting a right to possession of the slaves. The witness says nothing as to his mental capacity. He states that on the next morning after the slaves were taken, the plaintiff went across the river to where some people were camped; and procured a woman to go to his house, and get breakfast for him. After which he was very sick, and about to take a fit, but witness gave him some medicine, and he did not have one.

We think the Court excluded the only material portions of this deposition that were subject to objection—those relating to the declarations of John G. Estes.

4th. The bill of exceptions states that "the plaintiff called witnesses, by whom he proved that, at a former term of the Court, on the trial of this cause, John G. Estes testified as a witness in the case, before the jury. That, in his testimony, he stated that the $1800 note that he executed to his father, was not the only consideration given for said negroes, but, in addition, he was to take and support plaintiff the balance of his

15

life, build a house for him to live in, set the old negro woman, Milly, free at plaintiff's death, and relinquish all his interest in plaintiff's estate; and that the negroes were to remain with plaintiff until he built the house; and that the house was not built at the time the negroes were taken by defendant from plaintiff. That he went to plaintiff's the day before the bill of sale was excuted, having heard that he was sick; that when he got there, he found him out where the boys were thrashing some wheat, and in better health than he expected to find him. That after they were done thrashing wheat, he and the plaintiff put up some fence, then went to the house and ate some supper. That the next morning the plaintiff proposed to sell him the negroes in controversy, and he and the plaintiff agreed as to the price, which was $1800, in addition to the consideration and the agreement above stated; and he executed the note for $1800, and took a bill of sale from plaintiff for the negroes.

" To the giving of which evidence to the jury, the defendant objected, on the grounds that the statements of John G. Estes, offered in evidence, were made by him on the examination of the plaintiff; and because he was a competent witness in the case, and his testimony would be the best evidence of the facts sought to be established, and for the further reason that his statements, etc., were inadmissible, because made after the purchase of the slaves by the defendant of him, and tended to prejudice his title to them, and set up a parol contract not embraced in the bill of sale."

But the Court overruled the objection, and permitted the evidence to go to the jury.

It appears, from the bill of exceptions, that before the plaintiff called the witnesses to prove the testimony given by John G. Estes on a former trial of the cause, he read to the jury the deposition of Thomas J. Kelley, taken 17th January, 1856, who proved, among other things, that John G. Estes was then, and had been for a number of years before, a resident of the State of Missouri.

Being a non-resident of this State, the better opinion seems

to be, upon principle, that proof of what he swore on a former trial was admissible, though the decisions on this point are in conflict. 1 *Greenleaf Ev.*, sec. 163; *Notes of C. & H. on Phillip's Ev.*, vol. 3, part 1, p. 327; *Long ad. vs. Davis*, 18 *Ala. R.* 803; *Magill vs. Kauffman*, 4 *Serg. & Raw.* 317; 1 *La. An. R.* 392; 2 *Ib.* 890.

The learned annotators on Phillips' Evidence, after reviewing the decisions on this point, say, that those which favor the admission of proof of what a non-resident witness testified on a former trial, etc., come nearest to the liberal principle on which secondary evidence is generally received, are less anomalous, and therefore more scientific than the narrower decisions.

Mr. *Greenleaf*, after stating in the text that if the witness be out of the jurisdiction, proof of what he swore upon a former trial is admissible, says in a *note* (*vol.* 1, *sec.* 163, *note* 2), if he is merely out of the jurisdiction, but the place is known, and his testimony can be taken under a commission, it is a proper case for the Judge to decide, in his *discretion,* and upon all the circumstances, whether the purposes of justice will be best served by issuing such commission, or by admitting the proof of what he formerly testified.

Putting the case before us on this ground, the decision of the Court below must be regarded as conclusive on the point, there being no showing of any gross abuse of such discretion. *Bishop vs. Tucker*, 4 *Rich. L. R.* 178.

It is further objected that the testimony of John G. Estes was inadmissible, because given after the sale of the slaves by him to the defendant, and tended to prejudice his title.

The declarations of a vendor, made after the sale, are not admissible to impeach the title derived from him, but he is a competent witness for that purpose, because he is called to testify against his interest. *Porter et al. vs. Rea*, 6 *Mo.* 48; *Whitaker vs. Brown*, 8 *Wend.* 490.

It is no objection to the testimony of a witness that it goes to invalidate a title derived by deed from him. *Haddock vs.*

*Wilmarth*, 5 *New Hampshire* 181; *Wright vs. Nickols*, 1 *Bibb* 298; *Title vs. Grevett*, 2 *Ld. Raymond* 1008.

A party who has executed a deed is a competent witness to impeach it, etc. *Arnold et al. vs. McNeill*, 17 *Ark*. 179; *Caldwell ex. vs. McVicar*, 7 *Eng. R.* 750; *Tucker vs. Willamowicz*, 3 *Eng.* 166; *Hensley vs. Brodie*, 16 *Ark*. 511.

The remaining objection to the testimony of John G. Estes is that it sets up a parol contract not embraced in the bill of sale from the plaintiff to him for the slaves.

The bill of sale recites merely that Andrew Estes had sold the slaves to John G. Estes, "for the consideration of eighteen hundred dollars." Was it competent for the plaintiff to prove that John G. Estes was to give him an additional consideration for his slaves, which was not recited in the bill of sale?

The consideration recited in a deed is open to explanation, or contradiction, by parol proof, with the limitation that the operation of the deed, as a grant, is not to be thereby defeated. And this limitation does not prevail where the object of going into the consideration, as in this case, is to show that the deed was procured from the grantor by fraud, etc. See *Vaugine et al. vs. Taylor et al.*, 18 *Ark*. 65, *and the cases there cited; Bottomly vs. United States*, 1 *Story R.* 149; 2 *Phil. Ev.* 368.

Before the plaintiff introduced the proof of what John G. Estes swore on the former trial, the defendant thought proper to prove the declarations of the plaintiff, made before and after the date of the bill of sale, in reference to the additional considerations to be given him by John G. for the slaves. This the defendant did, perhaps, for the purpose of showing that the transaction was a fair one, and that the plaintiff had the mental capacity to understand the terms and make the sale, etc.

For these purposes, we think that both parties had the right to go fully into proof of what really were the considerations for the sale, regardless of the recitals in the bill of sale. *Bottomly vs. United States*, 1 *Story R.* 149; *Somes vs. Skinner*, 16 *Mass*. 349; 1 *Hatsted Ev.*, pages 204, 205, 206, 207, 208, 209,

*and cases cited;* 2 *Phil. Ev.* 368.    (The bill of sale was not under seal.)

5th. The instructions to the jury are next to be considered.

The plaintiff moved the following, which were given by the Court, against the objection of the defendant:

1st. That the only questions involved in the issues in this case are: first, was the plaintiff lawfully entitled to the possession of the slaves, mentioned in his declaration, at the time of the commencement of the suit; secondly, did the defendant unlawfully take them out of his possession.

2d. The law presumes property to belong to the possessor, and to sustain the issues, on the part of the plaintiff, it is necessary only to prove his possession, and a subsequent tortious taking by the defendant.

3d. The plaintiff having produced evidence to prove the possession, and the taking by the defendant, the defendant introduced evidence to prove the sale of the property by plaintiff to his son, John G. Estes, and a sale from the latter to himself; and the plaintiff then introduced evidence to prove that the bill of sale from him to his son was obtained by fraud and unfair practices.    Thus is presented for the consideration of the jury the question, whether the bill of sale from the plaintiff to John G. Estes is fraudulent.

4th. If the jury are satisfied, from the evidence before them, that the bill of sale from plaintiff to John G. Estes, was obtained through fraud or unfair and improper practices, at the time of the execution of the bill of sale, they should hold it absolutely null and void.

5th. Fraud, like crime, may be made out and presumed from circumstantial testimony.

6th. It is not within the province of the Court to charge the jury as to the sufficiency or insufficiency of the proof to establish fraud.    That is a question of fact for their consideration.

7th. If the jury believe from the evidence that plaintiff was an aged and infirm man, and subject to apoplectic or epileptic

fits, at the time he executed the bill of sale to John G. Estes; that the relation of father and son subsisted between the parties to the bill of sale; and that plaintiff was illiterate, and the consideration, for which the bill of sale was executed, was inadequate; and they are satisfied, from these facts and circumstances, that the bill of sale was obtained by fraud or unfair practices, they would be warranted in finding the sale void and of no effect.

8th. That the law watches with jealousy contracts entered into between parent and child, and requires the utmost good faith and circumspection, where it may be reasonably inferred that the one was subject to the influence of the other, and will presume fraud in all cases where the contract is entirely to the disadvantage of the weaker party; and the circumstances under which such contract entered into, are of a suspicious character.

9th. That plaintiff's advanced age and infirmities, his illiterateness, his state of health, and the condition of mind as indicated by his appearance and conduct, at the time he executed the bill of sale, the inadequacy of the consideration, the improvidence of the act, the confidence reposed in his son, the omission to express in the bill of sale, prepared by his son, the entire consideration, the retention of the slaves for some time after the execution of the bill of sale, the attempt of his son to take the slaves by force, and his subsequent sale at a reduced price to the defendant, whilst plaintiff held them adversely; the expedition put on foot for the seizure and abduction of the slaves, the secrecy with which it was gotten up and conducted, the stratagem adopted to accomplish the object of the expedition; apprehensions expressed by defendant, that he could not hold the negroes in Missouri; the proposition made by John G. Estes, to the son-in-law of plaintiff to effect a purchase of the negroes; the absence of any proof to show that John G. Estes obligated himself to perform the acts constituting a part of the consideration; the absence of satisfactory reason or excuse for not resorting to judicial process to establish the defendant's title in Missouri, are circumstances tending to prove fraud and un-

fairness in the sale from the plaintiff to John G. Estes, and the jury should take them or such of them as are proved to their satisfaction, into consideration in determining the question of fraud—and if they are satisfied from such facts and circumstances that the sale was tinctured with fraud, they should find for the plaintiff.

\*　　\*　　\*　　\*　　\*　　\*　　\*

13th. That although mere weakness of mind is no ground of incapacity, and affords no sufficient reason for setting aside a contract, it nevertheless constitutes a material consideration in finding fraud and unfair practices, when the contract is entirely to the disadvantage of the weaker party, and when taken in connection with other facts or circumstances, tending to show unfair practices, will authorize it.

\*　　\*　　\*　　\*　　\*　　\*　　\*

15th. That, in contracts of sale, when there is no agreement as to the time at which payment is to be made, the presumption is that payment and delivery are to be simultaneous, and the seller is not bound to deliver the property until payment is tendered.

\*　　\*　　\*　　\*　　\*　　\*　　\*

18th. That if the vendor of property, sold on a credit, retain possession until the credit expires, he has a right to retain them until payment.

19th. That the purchase of personal property in the adverse possession of another claiming it as his own, is the buying of a law-suit, and is not favored in law, and the purchaser takes subject to all outside equities existing between his vendor and those under whom he claims.

20th. That the possession of the plaintiff, after the sale, and the abduction by the defendant, and plaintiff's acts and declarations at and after the abduction, are circumstances tending to disprove a ratification of the alleged sale to his son.

21st. That if the plaintiff made declarations after the date of the bill of sale from himself to his son, respecting the sale of the negroes, in ignorance of the fact that his son held the

bill of sale for the negroes, such declaration would not tend to prove a subsequent ratification of its execution.

22d. That in order to ratify a void or fraudulent contract, it is essential that the party ratifying does it with a full knowledge of all the facts; so that, if plaintiff expressed himself satisfied with the sale in ignorance of the execution of the bill of sale, or any other material fact connected with such contract, such expressions are of no avail.

23d. That if the jury believe from the evidence that there was a verbal contract of sale entered into between plaintiff and his son John, by which John was to build him a house to live in, support him the remainder of his life, and set one of the negroes free at his death, and plaintiff was to remain in possession of the slaves until the house was built, and that the bill of sale to John was fraudulently obtained either before or after the verbal contract was entered into, such verbal contract would not be vitiated by the prior or subsequent fraud, and in that event the jury should find for the plaintiff, unless it be proved that the house was built before the slaves were taken from him by the defendant.

24th. That if the jury find from the evidence that the plaintiff is an old and infirm man, and that the defendant's vendor, John G. Estes, the plaintiff's son, obtained a bill of sale from the plaintiff for the property in controversy, which he wrote himself, and that said John G. did not express the entire consideration and condition of said bill of sale in the same, but left out a material condition, which was for the entire benefit of the plaintiff, and to the disadvantage of the said John G., it is a circumstance from which they may infer fraud, and that if they believe, from the evidence, that said condition was intentionally left out of said bill of sale by John G., for his own benefit, it makes said bill of sale absolutely fraudulent; and that if they believe these facts, they should find said bill of sale null and void."

The defendant moved the following instructions:

1st. That in order to entitle the plaintiff to recover under the

issues formed, he must prove that the slaves in controversy are his property, or that he had an immediate right to possession of the slaves, and that the defendant wrongfully took them from his possession.

2d. That if they believe a valid sale from the plaintiff to John G. Estes, and from John G. to the defendant was made, the sales vested an absolute title in the defendant without any formal delivery of said slaves.

3d. That if the jury believe from the evidence that John G. Estes executed and delivered to the plaintiff his promissory note, or writing obligatory, for the payment of $1800, as a consideration for the purchase of said slaves, and that the plaintiff accepted the same, it is a valuable consideration in law, and as binding upon the plaintiff as though the money had been paid him in hand; and although there were other considerations to be performed by the said John G. understood by the parties at the time, still the contract, as evidenced by the bill of sale from the plaintiff to the said John G., passed the absolute title in said slaves to the said John G. Estes.

4th. If the jury believe from the evidence, that the plaintiff, at the time of executing the bill of sale to John G. Estes, was from temporary illness, general mental incapacity from infancy, the infirmity of extreme old age, or other accidental depressions which result from fear, constitutional despondency, or overwhelming calamity, incapable of making a valid contract, still, if afterwards, and when relieved from the temporary disability under which he rested at the time of making such contract, he approved and affirmed the same, the contract thus made and subsequently approved, is valid and binding upon him, as if no such disability had rested upon him at the time such contract was made:

That if the jury believe from the evidence, that after the execution of the bill of sale to John G. Estes, and when in sound mind, the plaintiff recognized the contract made with John G. with regard to the said slaves as valid, such evidence is admissible, and should be received by the jury; and that such

recognition makes such contract, to all intents and purposes, valid as if at the time the same was made, he had been of sound mind. And so also evidence that prior to the sale of the slaves to John G. and while in sound mind, the plaintiff expressed a wish and intention to sell said slaves to John G. Estes, should be received by them as conducing to prove that he was competent to contract at the time of the sale of the slaves to John G.

5th. That if the jury believe from the evidence that the contract between John G. Estes and the plaintiff was valid and binding upon him, that the title to the slaves passed to and vested in John G. without any formal delivery, and that he had a right to sell and dispose of the same, and take them into possession at any time. And further, that if they believe that John G. Estes made a valid sale of said slaves to said defendant, he succeeded to all the rights of John G. in the slaves, and had a right to take possession of them, and that the manner of doing so in no wise affects the validity of the title.

6th. That if they believe, from the evidence, that after the execution of a bill of sale from plaintiff to John G. Estes, the slaves or either of them were in the peaceable possession, and employment of the said John G. it raises a presumption that they were delivered in accordance with the contract of sale; and such facts will be sufficient evidence of a delivery of the slaves, unless the plaintiff shall repel the presumption by affir mative evidence, showing that they were in his possession for another and different purpose.

7th. That if they believe from the evidence, that before the execution of the bill of sale by the plaintiff to John G. Estes, he proposed and offered to sell the slaves to him, the said John G., and furnished the said John G. with a form for drawing up the same, in accordance with which the same was drawn up, and that a portion of the said slaves were afterwards in the possession of the said John G. and in his service, and so remained until they ran away from him, and went back to the house of the plaintiff, and the said John G. pursued them to the

residence of the plaintiff, and there attempted to reclaim them in the presence of the plaintiff, and without objection on his part, and was only prevented from doing so by the obstinate resistance of said slaves; and that the plaintiff, after said sale, and when in sound mind, recognized his contract with the said John G. and expressed himself satisfied with the same, that these circumstances, and each of them, should be received by the jury as evidence, conducing to prove that the plaintiff was fully competent to contract at the time the same was made, and that the bill of sale fully expressed the terms and conditions of the contract, and was an honest and a fair one.

8th. That if the jury believe from the evidence, that the slaves in controversy were sold by the plaintiff to John G. Estes, on a credit, and a note executed by him to the plaintiff, for the purchase money, such note so accepted, was a sufficient consideration to uphold the contract, and the same being in other respects valid to vest the title of said slaves in John G. Estes, free from any lien for the purchase money, and that having so vested, before the plaintiff can claim the benefit of any lien upon the slaves for the payment of the purchase money, or a right to withhold them from the said John G. Estes, or the defendant holding under him, the plaintiff must prove, unless it otherwise appear in evidence, that the note was due and unpaid at the time the slaves were taken by the defendant from the plaintiff.

9. That if the jury believe from the evidence, that there was a contract in writing, executed by John G. Estes, for the slaves in controversy, in such terms as to import a legal obligation without any ambiguities as to the object or intent of the contract, they will disregard all oral testimony, or conversations, or declarations of the parties, before, or after, or at the time of the contract by them, and that no other words, declarations, or agreements are to be considered by them, to enlarge, diminish or alter the same.

10. That a contract otherwise legal and valid, cannot be rescinded without the consent of both parties, and it is not suf-

ficient for the vendor to offer to cancel the note given for the purchase money, nor will it avail him anything for that purpose, even if the purchase money has never been paid.

11. When a contract is once reduced to writing by the contracting parties, all oral testimony of a previous understanding, or of conversations, or of declarations, at the time when it was contracted, or afterwards, should be rejected by the jury.

12. That the mere inadequacy of consideration, of itself, is not sufficient to rescind and set aside a contract otherwise legal and valid.

13. That a party, in order to render a contract null and void solely in consequence of any temporary mental disability, must show that the mental disability existed at the time of entering into the contract, and it is not sufficient for the party to show that before or after the time he was deprived of his mental faculties.

14. That if they believe from the evidence, that the plaintiff, at any time, ratified and affirmed the contract made with John G. Estes, for the sale of said slaves, and before the sale to the defendant, the inadequacy of consideration cannot be taken into consideration in the contract between John G. Estes and defendant."

The bill of exceptions states that the Court refused to give the 4th instruction as asked by the defendant, but instructed the jury that: " the subsequent approval of the contract by the plaintiff would not make the same valid unless accompanied by delivery of the property sold, or receiving the consideration therefor, the plaintiff affirmed the same."

And the Court also qualified the 5th instruction by telling the jury that " the defendant would have a right to sell and dispose of the slaves in controversy, and take them into possession at any time after the consummation of the contract between the plaintiff and John G. Estes, and after the sale by John G. to the defendant, unless it appeared that the consideration was due and unpaid; and that the defendant would not have a right

to take possession of said slaves unless the said plaintiff held no lien for the price."

The Court also added to the 9th instruction, the following qualification:

"But that the jury should consider all evidence tending to show that a further consideration than that expressed in the writing was to be given, as a circumstance tending to establish a fraud in obtaining the bill of sale by John G. Estes from plaintiff."

It seems that the Court gave all the instructions as moved by the defendant, with the above qualifications to the 4th, 5th and 9th.

No specific objection has been urged to the plaintiff's 1st, 2d and 3d instructions.

It is insisted that the Court should have charged the jury, in connection with the 4th instruction, " that from subsequent recognition, or long acquiescence, they might presume that the fraud was waived, and the sale ratified by the plaintiff."

It is sufficient to say, in reference to this, that it does not appear that the Court was asked so to charge the jury in connection with, or as a qualification of the 4th instruction. The propositions which the defendant submitted to the Court, on the subject of the ratification of the contract, were given in charge to the jury, with a qualification of one of them, which will be noticed below.

It is objected that the Court told the jury, in several of the instructions, in effect, that *fraud might be presumed*.

Fraud is a crime, and like crime, it is not to be presumed, but must be proven. But fraud, as well as crime, may be deduced from facts and circumstances established by the proof.

The books abound with cases where men have been convicted and executed, or imprisoned for crime, whose guilt was deduced from circumstances. So there are numerous cases reported where deeds, wills, etc., have been declared null and void for *fraud*, deduced from circumstances in proof in relation to their execution, etc. No witness is expected or permitted to come into court, and swear in terms, that a bill of sale was

obtained by fraud, but he must state the facts and circumstances attending its execution, and the jury, under instructions from the Court, must determine whether or not they establish the fraud.

The rule in courts of equity, and in courts of law, in reference to proof of fraud, is thus laid down by Judge Story:

"Courts of equity do not restrict themselves by the same rigid rules as courts of law do, in the investigation of fraud, and in the evidence and proofs required to establish it. It is equally a rule in courts of law, and courts of equity, that fraud is not to be presumed; but it must be established by proofs. Circumstances of mere suspicion, leading to no certain results, will not, in either of these courts, be deemed a sufficient ground to establish fraud. On the other hand, neither of these courts insists upon positive and express proofs of fraud; *but each deduces them from circumstances affording strong presumptions.* But courts of equity will act upon circumstances as presumptions of fraud, where courts of law would not deem them satisfactory proofs. In other words, courts of equity will grant relief upon the ground of fraud, established by presumptive evidence, which courts of law would *not always* deem sufficient proof to justify a verdict at law. It is in this sense that the remark of Lord Hardwick is to be understood, when he said, 'That fraud may be presumed from the circumstances and condition of the parties contracting; and this goes further than the rule of law, which is, that fraud must be proved and not presumed;' (2 *Ves.* 155–6;) and Lord Eldon has illustrated the same proposition, (18 *Ves.* 483,) by remarking that a court of equity will, as it ought, in many cases, order an instrument to be delivered up, as unduly obtained, which a jury would not be justified in impeaching by the rules of law, which require fraud to be proved, and are not satisfied, though it may be strongly presumed." 1 *Story Eq. Juris. sec.* 190.

Considering the 5th, 6th, 7th, 8th, 9th, 13th, 23d and 24th instructions moved by the plaintiff, on the subject of fraud, in connection with those given at the instance of the defendant,

and in reference to the proof in the cause, though some of them contain expressions that are subject to verbal criticism, and taken separately are objectionable, yet taking them together, we find in them no substantial departure from the rules of law in reference to the proof of fraud, as above stated.

It may be well here to refer to some of the leading facts disclosed by the testimony, conducing to establish fraud on the part of John G. Estes, in obtaining the bill of sale for the slaves from the plaintiff, and upon which the instructions in reference to fraud, etc., seemed to have been based.

Sometime before the date of the bill of sale, John G. Estes, and a witness (*Andrew Estes*) were at plaintiff's house together. He was sick, very low, and unable to transact business. John G. proposed to witness that they should purchase the slaves of him, etc. Witness declined, on the ground that plaintiff was not in a condition to make a contract with them or any one else. John G. then expressed his determination to make the trade himself, and if he could not succeed, to take off the negroes, sell them, and risk his father pushing the law against him, etc.

*John B. Harris* (witness for defendant) testified that about the 1st of June, 1849, he proposed to purchase of the plaintiff one of the negroes—a woman. Plaintiff told him he would not sell her to him—that if he sold any of his negroes, he would sell all together, and that he expected to let his son John G. have them; that he was the only one of his children that was able to buy them all and *keep them together*. That he had made John G. a proposition that he thought he ought to accept. Plaintiff said he was living a very lonesome life, and expressed a desire to leave the place he then lived on. Witness saw the plaintiff again in the fall of 1849, and he told him that he had made the trade with his son John G., that he had told him about when he saw witness before—that John G. was to pay him $1,800 or $1,900 (witness did not remember which) in money, furnish him a house to live in near his own, take care of, and support him the balance of his life, free of charge, have no fur-

ther interest in any part of his estate, and at his death to set old Milly free. Plaintiff expressed himself well pleased with the trade.

Other witnesses, on the part of the defendant, testify to similar declarations made by the plaintiff, before and after the date of the bill of sale, in reference to the terms and conditions of the trade.

It also appears from the testimony of John G. Estes, that the plaintiff was to remain in possession of the slaves until he built the house for him, etc.

The evidence strongly conduces to prove that on the day that the bill of sale was executed, the plaintiff was laboring under the effects of a recent attack of fits, and his mind was not in a condition to consummate a contract of so much importance. In this both of the subscribing witnesses, and the other persons who visited him on that day, concur. John G. Estes wrote the bill of sale, sent for the attesting witnesses, read the instrument, signed the plaintiff's name to it, and showed him where to make his mark. He had nothing to say to the witnesses, or the visiters about the trade on that day. He seems to have been passive in the transaction. He was silent, listless, stupid and childish in his appearance and conduct. The bill of sale made no mention of the important considerations to be given by its draftsman for the slaves, in addition to the $1,800 in money, and yet the plaintiff, it seems, made no remark, took no notice of the omission. No money was paid him. A note for $1,800, not half the value of the slaves, was handed to him by John G., and he held it in his fingers, says one of the subscribing witnesses, and looked about as though he did not know where to put it. There was no delivery of the slaves at the time. They remained in possession of the plaintiff as before, with the exception that two of them were afterwards at the residence of John G. for a short time. There is no proof that he built the plaintiff a house to live in, or offered to take him and support him. Twelve months after the date of the bill of sale, availing himself of its advantages, he combined with the defendant to sell

him the slaves, and assist him to get possession of them by force, and run them off, etc. Whilst the defendant and his co-conspirators captured the slaves and brought them off in a boat fitted up for that purpose, the evidence conduces to prove that John G. Estes, and others, were stationed with horses at the point on the river where the slaves were to be disembarked, for the purpose of carrying them off.

The plaintiff, over seventy years of age, wasted by disease, and subject to fits, was left alone upon his farm without a servant to cook for him, or otherwise supply his wants. The family of slaves, which he had owned for many years, to which he was doubtless attached, and which were to be kept together, by his son, according to the terms of their trade, were forcibly seized and carried away to the south, to be sold to strangers, and the profits to be divided between his son and the defendant, and all this was to be upheld and legalized by means of a bill of sale obtained from the plaintiff when he was not in a condition to transact business, and which did not express the terms of the trade which he had in point of fact made. The defendant expressed the belief that he could not hold the slaves in Missouri, obtained under such circumstances, and we have yet to learn that the laws of Arkansas sanction the perpetration of fraud.

We repeat, therefore, that taking the instructions of the Court in reference to fraud, together, and considering them in connection with the evidence, we find in them no material and substantial error.

It is objected that the 9th instruction assumes the existence of the facts recited in it, instead of stating them hypothetically. This objection is not true in point of fact. The instruction refers to a series of facts which the testimony conduces to prove, and then tells the jury that they should " take them, *or such of them as were proven to their satisfaction*, into consideration in determining the question of fraud," etc.

It is objected that several of the other instructions given for

16

the plaintiff, are based upon the testimony of John G. Estes, which should have been excluded. We have decided that the Court did not err in admitting the proof of what he swore upon the former trial.

It is also insisted that some of the plaintiff's instructions were abstract. Perhaps they were, to some extent, but they appear to have been framed with the view of meeting different aspects of the case, like a number of the instructions given for the defendant, and the instructions moved by both parties were unnecessarily numerous.

On the subject of the ratification of the contract, and the instructions moved by both parties in reference to it, we need only remark that we find no satisfactory evidence in the record, that the plaintiff ever spoke of, or referred to the bill of sale, its execution, or its contents, at any time between its date, and the time when the slaves were taken out of his possession. On the contrary, it appears manifest that when he spoke of the sale of the slaves to his son, at the several times mentioned by the witnesses, he referred to the *trade* made by them, embracing all its terms and conditions, as stated by him. A modification of that agreement or trade would be one thing, and the ratification of the bill of sale, which omitted important stipulations of the trade, would be another. In this view of the evidence, the modifications made by the Court in some of the defendant's instructions, were not objectionable.

It would be fortunate if a circuit judge, in the haste of a jury trial, could pass upon the numerous instructions moved by the parties, without committing errors. And it would be an unfortunate practice for the administration of substantial justice if this Court were compelled to reverse a case for such errors, regardless of their legal consequence upon the result of the trial. Under such a practice, but few judgments would be affirmed, however just upon the whole record.

Our conclusion in this case, upon the whole record, is, that the Court, in view of the evidence, in giving the instructions moved by the plaintiff, in connection with those given for the

defendant, committed no error by which the defendant was legally prejudiced.

The judgment is therefore affirmed.